# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Sai-E   Johari,

        plaintiff,

      v

Columbus Metropolitan Library, et al.,
Susan Studebaker, Martha White,
Forest Sorenson, Fonzell Johnson,
Dwayne A. Wils and Sara Mackie,

      v

City of Columbus Division of Police, et al.,
Officer Althgrr (#2265)      defendants.

Case Number C2-03 - 950

JUDGE FROST

MAGISTRATE JUDGE ABEL

## COMPLAINT

Jurisdiction in this case is based on **Title 28 U.S.C. Section 1331**. This is a pro se **Title 42 U.S.C. Section 1981, Title 42 U.S.C. Section 1983** and a **Title 42 U.S.C. Section 1985** cause of action. Specifically, while acting under color of state law, and in their individual and official capacities, the defendants willfully, maliciously and intentionally subjected plaintiff to invidious discrimination and a denial of his substantive 1st, 4th, 8th and 14th amendment rights as guaranteed by Constitution of the United States.

Because the misconduct of each defendant rises above a mere tort plaintiff invokes all pendant state law claims. Additionally, pursuant to Ohio law plaintiff brings a separate claim of emotional distress. The defendants either knew, or should have known their actions were unlawful; but with deliberate indifference they engaged in them anyway.

1

## <u>COUNT ONE</u>

1. For approximately one year plaintiff has been going to the North side branch of the Columbus Metropolitan Library, located on the block of West 8th and North High Street.

2. On 9-15-2003, plaintiff went to the above mentioned branch to use a computer.

3. After logging on, an unidentified white male approached plaintiff and asked if he could speak with plaintiff? 4. After plaintiff agreed, the man started out by saying he was a homosexual. 5. The unidentified man then stated he was collecting signatures to force the City of Columbus to recognize gay marriages. 6. At this point plaintiff interrupted the man and stated that although plaintiff accorded homosexuals the same respect he accords all other citizens, plaintiff still did not believe in gay marriage. 7. The unidentified man wondered why plaintiff held what he termed a homophobic view? 8. Plaintiff stated that just because plaintiff did not believe in homosexuality doesn't mean plaintiff is homo-phobic. 9. Plaintiff went on to say it was more like most homosexuals are hetero-phobic. 10. Specifically, anytime a so-called straight person exercises their rights and speaks out against homosexuals, just like homosexuals exercise their rights and freely advocate their unnatural lifestyle, the first thing homosexuals try to do is label that person homo-phobic. 11. To plaintiff however, it's more like homosexuals are hetero-phobic. 12. They have become so twisted in their thought process they actually believe the natural union of a man with a woman is wrong, and the unnatural union of a man with another man is right. 13. Accordingly, pursuant to section one of the homosexual code, anyone who dares to speak out against homosexuals is to be branded homo-phobic. 14. Homosexuals every-where are then told to make life as miserable as possible for that person. 15. In response to plaintiff's view, the unidentified man told plaintiff he needed to re-read history.

16. Plaintiff informed the man that plaintiff is a Historian, so plaintiff knows history very well.  17. Specifically, if one were to go back to any ancient Black Empire, nowhere would anyone ever find any Black tribe that either believed in, advocated or even tolerated homosexuality.  18. Nor could homosexuals produce the record of any Sooten (or King) of Egypt who either believed in, advocated or condoned homosexuality.  19. Plaintiff went on to state that 15 Dynasties would have to rise and fall before any ancient Blacks ever witnessed the open practice of homosexuality.  20. Specifically, after the coming of the Jews (around 1,200 B.C) their original Targums, and their latter-day Torah stated that Jews and other nations living around Egypt engaged in homosexuality.  21. During the 24th Dynasty  (around 900-600 B.C.)  Homer and Herodotus came to Egypt to learn how to read, write and take high culture back to their land.  22.  These two ancient eye witnesses state that because homosexuality had become so prevalent throughout their culture, another name for it was " Greek Love."  23.  If one were to read Phyrussian or Greek (in English) mythology, one would find it replete with references of Greek gods themselves engaging in homosexuality.  24. Because of this pro-effeminate attitude, this is why homosexuals are quick to let everyone know that even Alexander the Greek (around 300 B.C.) is reputed to have openly practiced homosexuality.  25. And although Yahshua or Jesus (in English) some three centuries later  (around 30 B.C.)  is never quoted as condemning homosexuals, equally, homosexuals cannot produce any record of Jesus condoning their lifestyle either.

26. Finally, plaintiff told the unidentified man that although homosexuals try to equate their hardship with the hardships Blacks have faced, the plight of Blacks  (because of our race), versus the plight of homosexuals  (because of their sexual orientation)  is not the same.

27. Specifically, as certified by history, because Blacks engaged in natural relations with the opposite sex, whenever we unjustifiably would be attacked, we would always move away and continue to perpetuate our societies. 28. But the reason homosexuals don't move to some south Pacific island and form let's say, Fagville or Diketown is because, if all the men are with men, and all the women are with other women, there is no way these people can perpetuate their society? 29. In this instance the only way homosexuals could perpetuate their society is that, the natural heterosexual union of sperm with eggs will have to take place, either by natural heterosexual means, or by some other heterosexual (not homosexual) artificial facsimile.. 30. But under no circumstances will the god of homosexuals provide a means for these people to homosexually reproduce their kind..

31. Instead, if every homosexual man is only with another man, and every lesbian woman is only with another woman, when these people die their society will die with them.

32. Consequently, the previous is the exact reason why predator homosexual men and women are forced to recruit, beguile or lure innocent, confused, and very impressionable teenage boys and girls into what many term a perverted lifestyle. 33. Further, unlike women who can make a case for being bi-sexual, homosexual men do not come out of the womb suckling on the breasts or anything else of another man. 34. Instead, it is plaintiff's view that while in a state of confusion and impressionability, an innocent boy or girl will be taught the homosexual lifestyle by some other homosexual. 35. This beguiled adolescent will then decide whether or not the experience was a one time thing, or whether it will become a lifestyle. 36. Thus, in plaintiff's view no man or woman is born homosexual.

37. It is a learned behavior, similar to when kids learn to use drugs and alcohol.

38. Unless ones mother is an addict, no child comes out of the womb addicted to drugs or

alcohol. 39. One learns this lifestyle and either decides to live it, or leave it alone.

40. After listening to plaintiff's views the unidentified man got up, put his petition in his

brief case, and just walked away without saying another word. 41. After turning towards

the checkout counter plaintiff noticed that four, self admitting homosexual male employees

of the Library (3 white, 1 Black) were listening. 42. They were enraged by plaintiff's

views. 43. These men then started talking under their breath, but loud enough so plaintiff

could hear them. 44. They called plaintiff homophobic and racist. 45. Whenever plain-

tiff would pass the gay bars around Butles & N. High Street, plaintiff would have occasion

to see the self admitted homosexual employees of the North side branch Library socializing

with other self admitted homosexual men. 46. As plaintiff would ride by these men would

jeer, loud talk and call plaintiff other derogatory names. 47. A few days later on 9-19-

2003 plaintiff again went to the North side branch Library. 48. After logging on plaintiff

had to use the bathroom. 49. Thus, plaintiff asked the reference clerk Sara Mackie if she

would watch plaintiff's computer? 50. defendant Mackie agreed. 51. Even though

plaintiff only took approximately four minutes, when he returned defendant Mackie let

some other unidentified white male log plaintiff off, and cause plaintiff to lose all the data

he was working on. 52. When plaintiff objected, defendant Mackie stated, " Well I can't

watch everything at once you know?" 53. One of the self admitted homosexual male

employees then came up to plaintiff and told him to quit giving defendant Mackie a hard

time. 54. This unidentified male then told plaintiff to leave. 55. This unidentified man

then grabbed plaintiff's arm in an attempt to pull plaintiff out of the Library . 56. Plaintiff

yanked his arm free and told the employee not to touch plaintiff. 57. The self admitted

homosexual man then called an unidentified Black female security guard to come and make plaintiff leave. 58. Without knowing, or even investigating to ascertain what happened, the unidentified guard told plaintiff to leave. 59. Plaintiff told the guard he was the victim of white racism and hetero-phobia, and that plaintiff would be seeking redress. 60. Plaintiff then told the guard that in 1995 plaintiff had already successfully sued the Columbus Metropolitan Library. 61. Plaintiff further stated he would not hesitate to sue the Library again, if the security guard allowed herself to be used as a sounding board to further the hetero-phobic scheme of the Library's gay employees. 62. As verified by the Library's security cameras plaintiff then proceeded to leave. 63. The guard however would not let plaintiff exercise his right to liberty and leave. 64. As verified by the security cameras, the guard followed plaintiff out of the Library, unsnapped her gun and demanded that plaintiff give her plaintiff's name. 65. Plaintiff told the guard that she was just like the police, and unless a crime has occurred or is about to occur, the guard could not issue plaintiff a valid order to do anything. 66. Irate over plaintiff's refusal to talk with her, the guard told plaintiff he did not know what he was talking about and that plaintiff was not a lawyer. 67. Plaintiff stated that of sorts he was a paralegal. 68. As verified by the security cameras, plaintiff then again attempted to exercise his right to liberty and leave. 69. While leaving the guard shouted because plaintiff refused to talk to her, and threatened to take legal action against various Library staff members, plaintiff was not to come back for the rest of the day. 70. Plaintiff told the guard plaintiff did not plan to come back while she was there. 71. Plaintiff then told the guard there are two kinds of threats. 72. One cannot threaten to do bodily, or property harm to another. 73. One can however threaten to sue for some perceived wrong. 74. Citizens can also threaten to seek out other

forms of legal redress without fear of reprisal.   75.  Plaintiff then stated because the guard

retaliated against plaintiff for threatening to exercise his constitutional rights, plaintiff

intended to complain to the guard's superiors.  76.  As verified by the security cameras

plaintiff then peacefully left the scene.  77.  A few days later on 9-23-2003, plaintiff

decided to exercise his rights and go back to the North side branch Library.  78.  After

logging on plaintiff like usual said nothing to anyone and just did his work.  79.  Approxi-

mately 20 minutes later, four City of Columbus police officers and a Metropolitan Library

security guard named Dwayne Wils confronted plaintiff.  80.  They told plaintiff to come

with them to a secluded area of the Library.  81. Defendant Wils then demanded that plain-

tiff give up his I.D.  82.  Plaintiff refused on the grounds that plaintiff had not committed a

crime, nor did plaintiff break any Library rules.  83.  Just then a City of Columbus police

officer named Althgrr  (#2265) stated " Whenever citizens are asked by law enforcement

personnel to produce identification they must, or by law, you can legally be handcuffed and

placed inside a cruiser until an officer can ascertain who you are. "  84.  Plaintiff asked

defendant Althgrr to give plaintiff the Ohio Revised Code number that says citizens must

produce identification when requested, or direct plaintiff to where he could go view said

law?  85.  Defendant Althgrr stated he did not know the O.R.C. number or where plaintiff

could go to view said law.  86.  Defendant Althgrr then again demanded that plaintiff give

up his I.D.  87.  In response to the request plaintiff told defendant Althgrr that unless a

crime has occurred, or is about to occur, police officers cannot give citizens a valid order to

do anything.  88.  Plaintiff then stated that if defendant Althgrr tried to unlawfully detain

plaintiff, defendant Althgrr was opening himself up to serious repercussions.  89.  Defen-

dant Althgrr said, " Let me show you what my Ohio Revised code says."  90.  Defendant

Althgrr then grabbed plaintiff by the arm and began twisting and bending it behind plain-

tiff's back.  91.  Defendant Althgrr then started handcuffing plaintiff.  92.  Defendant

Althgrr then said until he found out who plaintiff was, he was going to place plaintiff in the

back of his cruiser.  93.  Tired of unjustifiably being accosted plaintiff stated, "Alright; I'll

show you my identification!"  94.  As plaintiff attempted to open up his fanny-pack to get

his identification, defendant Althgrr unlatched his gun and shouted " Don't open up that

up!  You might have a gun or some other weapon in there!  Give it to me.  I'll open it

up."  95.  As verified by the security cameras defendant Althgrr then illegally began

searching through plaintiff's fanny-pack.  96.  Defendant Althgrr then took plaintiff's

identification and gave it to defendant Wils.  97.  Defendant Wils copied down plaintiff's

information.  98.  Without notice or giving plaintiff an opportunity to be heard, defendant

Wils stated that plaintiff was evicted from all City of Columbus Metropolitan Library's for

one year.  99.  Plaintiff asked if he could appeal the adverse action?  100.  Defendant Wils

stated there was no appeal.  101.  After unlawfully being accosted and detained plaintiff

was told to leave.  102.  Because of the defendant's deliberate indifference, plaintiff

suffered an actual injury of being denied his 1st amendment right to liberty and his 4th

amendment right to privacy and freedom from unreasonable searches and seizures.

103.  Plaintiff was also denied his 8th amendment right to be free from excessive force and

cruel and unusual punishment.  104.  Plaintiff was also denied his 14th amendment rights

of equal protection and due process.  105.  The actions of the defendants also caused

plaintiff to suffer extreme emotional distress, headaches and depression.  106.  The actions

of the defendants also humiliated and embarrassed plaintiff in front of various adults and

children who wondered what crime did plaintiff commit to be accosted by four City of

Columbus police officers.   107.  Plaintiff also suffered the actual injury of having

disciplinary action taken against him without " notice " and/or being given the opportunity

to be heard.   108.  The defendants either knew, or should have known that subjecting

plaintiff to the mistreatment they did violated clearly established law.   103.  But with

egregious callousness  and deliberate indifference, all of the named defendants subjected

plaintiff to a denial of his constitutional rights anyway.


## COUNT  TWO


1.      Plaintiff re-alleges all of the averments contained within Count One and

incorporates them by reference as if fully restated herein.   2.  After unlawfully being

accosted by their subordinates, and having adverse action taken against him, plaintiff called

(614) 645-2900 and attempted to complain to defendants Susan Studebaker and Martha

White   3.  Defendant Studebaker is the Director of the Columbus Metropolitan Library,

while defendant White is the Assistant Director.   4.  After being transferred plaintiff was

connected to a woman named Deshawnda, who stated she was defendant Studebaker's

secretary.   5.  Plaintiff asked to speak with defendant Studebaker or defendant White.

6.  The secretary stated defendants Studebaker and White don't accept incoming calls from

the public.   7.  The secretary then demanded that plaintiff tell her the nature of his call.

8.  Plaintiff told the secretary he wished to file a complaint against the various employees

of the North side branch.   9. The secretary noted plaintiff's complaint and stated she would

forward the information to defendant Studebaker, and that either she or defendant White

would be in contact with plaintiff the next day.  10.  The next day no call came.  11.  As verified by plaintiff's cell phone records he called defendants Studebaker and White again.  12.  Once again however, defendants Studebaker and White refused to take proper action.  13.  Defendants Studebaker and White instead told their secretary to transfer plaintiff to the Security Department.  14.  Plaintiff was then transferred to a one Fonzell Johnson, who stated he was the assistant head of security.  15.  After listening to plaintiff's complaint defendant Johnson stated he still was not going to act.  16.  Defendant Johnson stated he heard about plaintiff's views and didn't like them.  17.  Plaintiff then asked to speak with defendant Johnson's superior.  18.  Defendant Johnson gave plaintiff the name and phone number of a one Forest Sorenson.  19.  Defendant Johnson then told plaintiff not to ever again call defendant Studebaker's secretary.  20.  As verified by plaintiff's phone records plaintiff called defendant Sorenson.  21.  Even after plaintiff gave defendant Sorenson the names of various witnesses who saw and heard everything, defendant Sorenson still refused to take proper remedial action.  22.  Instead, as verified by plaintiff's phone records, defendant Sorenson called plaintiff and stated that plaintiff was barred from all branches of the Columbus Metropolitan Library.  23.  Plaintiff told defendant Sorenson it was unlawful for him to take adverse action against a citizen without according them " notice " that the matter is pending, and then giving them an opportunity to be heard.  24.  Plaintiff then asked defendant Sorenson if he was going to acquiesce to the unlawful conduct of his subordinates?  25.  Defendant Sorenson stated although he wasn't there and didn't see what occurred, he still wasn't going to lift the ban.  26.  Plaintiff then asked defendant Sorenson if plaintiff could appeal the adverse action?  27.  Defendant Sorenson stated there was no appellant process and that his word was final.  28.  Per well established law no

citizen may be subjected to any form of adverse action without first being given notice and the opportunity to be heard.  29.  But with a total disregard for the law, the defendants intentionally denied plaintiff his rights anyway.  30.  As a direct and proximate result of the defendants actions, plaintiff suffered an actual injury of being denied his 1st, 4th, 8th and 14th amendment rights.  31.  The manner in which the defendants violated plaintif's rights is in direct violation of **Title 42 U.S.C. Section 1981** and **Title 42 U.S.C. Section 1983**. 32.  Because homosexuals can be considered a race or creed regardless of their ethnicity, when various City of Columbus police officers lent themselves to further the scheme of the Libraries gay employees, they violated **Title 42 U.S.C. Section 1985**.

WHEREFORE, plaintiff demands that this honorable court:

1. Grant Injunctive Relief in the form of enjoining the defendants from continuing to subject plaintiff to the adverse action they subjected him to.

2. Grant Injunctive Relief in the form of striking down the defendant's policy of taking adverse action against a citizen without according them notice or the opportunity to be heard.

3. Grant Compensatory Relief in the form of awarding plaintiff $50 Million dollars in compensatory damages or the highest amount decreed by law.

4. Grant Punitive Relief in the form of awarding plaintiff $100 Million dollars in punitive damages or the highest amount decreed by law.

5. Award plaintiff's lawyer attorney fees.

6. Tax all costs to the defendants.

7. Grant any and all other relief the court deems appropriate.

Respectfully submitted,

Sai-E  Johari    (pro se)
P.O. Box 10342
Columbus, Ohio 43201